In our second case United States versus Lowers or Lowers? Nico Lowers, your honor. Lowers. Yes, sir. Mr. Tarleton. Yes, your honor. Good to have you with us, Mr. Tarleton. Thank you, your honor. You're gonna explain all this to us. I'm gonna do my best and I've reserved three minutes for rebuttal. That's fine. Here no exception to the warrant requirement applies because the government having the burden never established that the files reviewed by humans at Google were the files that the detective opened and visually examined and used detailed information from in their search warrant applications. By doing so the detective went beyond the holdings of the Supreme Court and Walter. Now where was at what point do you say things were done wrong? At the point that the NCMEC cyber tip was given to the local law enforcement in Chesapeake, Virginia. By what? By who? NCMEC, it's a quasi-government funded nonprofit. The National Center for Missing and Exploited Children. That's the outfit that got them from Google? Yes. Google sends it to NCMEC, sends a, creates a cyber tip report that goes to NCMEC that's sort of this intermediary. What do you call it, NCMEC? NCMEC, yes. We get these government acronyms and I can't understand them. Yes, your honor. I've been around the government a long time. So this is called NCMEC. NCMEC, your honor. Okay. And, but you're not, go ahead. NCMEC sent them to a law enforcement agency. That's correct. Which they're required to do by law. That's correct. If, if, what's the if? What, under what circumstances is NCMEC required to send them to the law enforcement agency? The statute, your honor, 2258A talks about they have to make available to local law enforcement. If what? The, there's a parent violation of our. A parent? That's right. A parent violation. A parent violation of child pornography? Yes, your honor. Within the platform of an internet service provider like Google or Microsoft or AOL or Apple or Facebook. The NCMEC obligation. And NCMEC here made them available to Chesapeake, Virginia Police Department. Yes, your honor. Made available, it says, J. Was that, was that transfer to making them available to Chesapeake a violation of the Fourth Amendment? In your view? Making available is not, no, your honor. Okay, so Google make it, didn't violate the Fourth Amendment. Well, they can't. They're a private actor. You don't claim they defiled the Fourth Amendment. NCMEC didn't violate the Fourth Amendment. That, NCMEC didn't here because if you look at J93 where the cyber tip starts, NCMEC itself only looked at what humans at Google looked at. They did not, according to cyber. Now, where's the requirement that humans need to look at it? Is that, is that some statute? No, your honor, that's a. That I haven't seen? It's not a statute, your honor. It's. Well, then it's got to be a requirement that you're saying it is. It has to be apparent child pornography, I thought you said. For the report. It has to be apparent child pornography. Right, your honor. And the determination here was made by Google by looking at and applying an algorithm that, according to Google, identifies the apparent child pornography, correct? According to Google. Is that correct or not? Yes or no? It, if possible, it says possible child pornography, potentially, your honor. It says apparent child pornography is what they sent over. That's right. They, they just, they sent it over as apparent child pornography. That's right, your honor. And their algorithm and human eyes had determined it was apparent child pornography. That's not entirely true, your honor. Human eyes are. That's not entirely true. Or what part of it is, is somewhat wrong. Okay, there's a hundred and fifty-six files. Isn't your problem that, isn't your argument that the law enforcement here went rummaging around and looking at images that nobody, no, no human and no algorithm had looked at before and they did so without a warrant? Is that your argument? Yes, your honor. And that argument doesn't hold water if everything that Google sent over was looked at and identified by the algorithm as apparent child pornography. And Judge King, I would agree with you if that were true, but that's not true. Well, it is true. Google. Well, that's what Google says, or the other brief says it's true. That, matter of fact, they say that, that the algorithm is accurate to something like one in nine zillion times. It makes a mistake. Once in what, nine zillion times it makes a mistake. It's, it's as accurate as the DNA. And the courts accept DNA. And the issue is, they identified it. The algorithm identified it. There's nothing in the statute that says it has to be identified by a human being. But they say they identified it by human eyes before they, and confirmed it by the algorithm. Well, let me ask you this. So, just so I'm sure, make sure I'm understanding what, on the Google end. So they, this, they have this hash match technology. And the technology, my understanding is kind of flags something that may be, I guess, suspicious or, and then Google has humans look at the sampling, I guess, to see on that sampling, if it is in fact pornography. Is that how? Yes, Your Honor. And I may be making it, I'm sure, a little more simplistic than what it is. But, and so here, there is a hundred and fifty-six items that were maybe flagged by the hash match, right? Or 51 or whatever that number was, right? That's correct. A hundred and fifty-six files from Mr. Lauer's digital container at Google, his Google Drive account, were flagged by the hash value matching algorithm. Okay. Of those 156, only 31 of those files were actually opened up and reviewed with eyes by humans at Google. The remaining one... Now, were they, they looked at by eyes at Google before they were identified by the algorithm? After they were identified by the algorithm. You say that there were, that there's a hundred and twenty-five or something? Hundred and six. That, that weren't looked at by human eyes? At Google. That's correct, Your Honor. At Google. Right. Just the, just the algorithm. And is there, there's nothing really in the record attesting to the accuracy or reliability of this Google hashing technology, is there? That's right, Your Honor. The closest thing would be at J, I think, 139. That's the declaration from legal counsel at Google that further explains the cyber tip report that goes to NCMEC. In that declaration, it's only a few pages. They outline in broad strokes how their hash value matching technology works. It's proprietary. It's different than, say, Microsoft's hash technology or Facebook's. Google's technology, and this is important to understanding the limits as to its purported reliability, it ultimately, the, the technology might say that the contents of one file is substantially likely to match the image contents of somebody else's file through the algorithm. But what it can't say is it's a virtual certainty that, that it contains an image that violates the federal definition of child pornography, 2256. The reason it can't is because it turns on human fallibility. The whole origin of the... So that's the reason why they have actual human eyes look at, to verify. Exactly, Judge Benjamin, yes. Okay, so here we only other 156, only 31 were looked at with the human eyes. Exactly. Okay. Yes, Your Honor, only 31. And you're confident of those facts? Yes, Your Honor. And, and you're confident that there's a requirement that you have, the human eyes have to look at it? That comes from, Your Honor... It's not in the statute? It's from the Supreme Court. The Supreme Court says that? Jacobson. The Supreme Court's reviewed this? The Supreme Court has not weighed in on the hash value matching, but the whole origins of the private search doctrine derived from two key cases in the 1980s, Jacobson... Private search doctrine derives from Bordeaux versus McDowell, 1921. Yes, Your Honor. There's the private search doctrine. And Bordeaux is human eyes looking at letters? Well, that's all they had back then. They didn't have computers. That's right. But they, right, but, but Google says there is a reliable... So the best analogy, then, Your Honor, is it's an informant. And maybe it's a strong level of probable cause, but all it is is probable cause. Well, if it's one in nine zillion, that's a lead pipe cinch. It's not, it's a lot of probable cause. Your Honor... The district court says it was one in nine million, and that's derived from material in the record. Your Honor... It's in the district court derived... You don't like that material. Your Honor, it's, you know, I don't condone anything that factually happened in this case as to, like, violating the law. That's, but the point here is no amount of probable cause. This is the Ninth Circuit of Wilson, the Second Circuit in May here. No amount of probable cause creates an exception to the warrant requirement. Probable cause, you have to go get a warrant. The private search doctrine from Berdeau versus McDowell applies here, because Google is a private party, and they're the ones that identify it. What your issue relates to these, what they sent over to this outfit. There's no question about that. What did Google identify, and whether, whether it was reliable, whether it was probable cause. They did it, and that Fourth Circuit, the Fourth Amendment doesn't apply to Google. And, Your Honor, on this record, Google's algorithm is not the functional equivalent of a human being weighing the nuanced content. You say that's on this record, and you're doing a good job for your client. I agree with that, and I admire what, how much you had to learn about this stuff. It's a lot, Your Honor, and this aligns with the approach by the Ninth Circuit in Wilson, and the Second Circuit in Marr. Of course, there is a circuit split. And there's a Fifth Circuit case, and a Sixth Circuit case. They go the other way. They do go the other way, and they are flawed, and the Ninth Circuit and the Second Circuit are better, because a detective, a human being, visually examining a... So, we're dealing with a straight-up circuit split. We are. Yes, Your Honor. You might, you might, they'll make a Supreme Court lawyer out of you, with this case. Well, I just want to get through this court. So, speaking of this court, assuming we were to find a Fourth Amendment violation, how do you, how do you get around the government's, if you can, attenuation argument that this is so many steps removed from, you know, we start with Google, and go here, and go there, and it's, I mean, several steps before we finally get to your client. Yes, Your Honor. I think that those exceptions, attenuation and good faith, don't save the government from the operation of exclusionary rule here, because, first, under the, this prism, an important prism, the government has the burden, just as it does to establish the exception of the warrant requirement, it has the burden to establish the operations of the exclusionary rule. Here, the government... There's some disagreements here about who has what burdens, I think, aren't there? Between you all, between you and the government? The district court put an initial burden on us to establish the objective, subjective expectation of privacy, but beyond that, the law is clear. Coolidge versus New Hampshire, and show that there's a, that a narrow exception to the warrant requirement exists, and just as this court in Stevens, as well as Seidman, applying exceptions to the exclusionary rule and good faith doctrine, as well, the government bears these burdens to show the exclusionary rule shouldn't operate. So here, with attenuation, your honor, the government... But we don't get to attenuation or good faith unless there's a violation of the Constitution. That's right. Right, and I just asked him to assume that there is, how can he get beyond attenuation? So here, your honor, Wong's son and this court in Seidman and Stevens are example cited, and your honor was on the dissent on Stevens, but there's an important principle. Well, actually, as to attenuation, we look at Seidman. The government's chief argument, I think, is other than passage of time, and this court has also said that there's no magical amount of time that passes to create attenuation, but other than passage of time, Mr. Lauer's consenting to a search of his phone when the detectives came to interview him after they searched his parents' house in Virginia, and they interviewed him in North Carolina, hence why this case comes out of the Eastern District of North Carolina. When they interviewed him, he gave consent, but the problem with the district court and the government's analysis is free will, an exercise of free will under the Fifth Amendment standard for what's a voluntary confession is different than the Fourth Amendment exclusionary rule that they have to approve doesn't apply, which is a stricter standard. It derives from the Supreme Court in Wong-Sun. Did the police use some kind of... You would have to say that there's any evidence of coercion, right? Not under the Fifth Amendment, Your Honor, but the Fourth Amendment analysis is different. They have to prove, and they disavowed an evidentiary hearing below, that's at J. 234. They have to prove that they didn't use information from any unlawful search in questioning the suspect. That could have influenced the suspect's decision to get consent. And here we know that they were questioning him and they relied on what they obtained from Google in their first search warrant to get the contents of the Google account after they already did the warrantless review of the photos or images. Then they, using that information along with information from a warrantless search, they got a search warrant for his parents' house and from there they did forensic examinations on devices, electronic devices, at his parents' house as well as interviewing... So how many Fourth Amendment violations are you claiming there were of that? Half a dozen? A fair amount because they kept on repeating the Fourth Amendment violations in every single warrant that they got. But they started with this outfit, whatever the acronym is, sending it to Chesapeake. They started, Your Honor, when they got it and then they went beyond just the report. They double-clicked and opened the files and those are digital containers. Which Google had said are apparent child pornography. Right, under unknown standards that Google uses to train Google reviewers. They're not law enforcement officers and 2256 shows that the definition of what constitutes child pornography is incredibly broad. There may be extreme cases of certain images that clearly are but that statute is so broad it talks about any image of somebody under the age of 18 who's nude and maybe giving a lewd or lascivious exhibition or things that are very debatable and highly subjective. Are you claiming that the algorithm doesn't take that into account or something? Not only does it not, it can't. You're claiming it's flawed or some way? The algorithm does not even purport to analyze the, apply the federal definition. All that, the algorithm really answers the wrong question. It says... So you attack the algorithm? Yes, Your Honor. Okay. Yes, we can assume it's reliable but it's reliable answers the, this is the Ninth Circuit's reasoning. It's not foolproof. It's not foolproof and here we have a even more deficient evidentiary record. There's no experts offered by the government under its burden to prove up the high reliability of it but you could assume it's highly reliable. Are you saying there ought to be a, should have been an evidentiary hearing of some kind? The, we had no burden. The government had the burden and they disavowed... You don't answer my questions very often. Are you, are you saying that they need to have a hearing? We say no, not now, Your Honor. They should have been. I didn't ask you that. Are you saying they should have had a hearing? They should have to carry their burden, yes. You're saying they should have put forward... If you just listen to the question, you can answer it. Yes, Your Honor. But you answered another question that you wish you'd been asked. Yes, Your Honor. Now, I don't blame you. I mean, they treat, they must teach a lot of these lawyers that in law school but we want some people who come down here that we want them to be straight with us. Yes, Your Honor. But there was no hearing and no one requested one. That's correct, yes. That's right. That's what the record shows. Yes, Your Honor. And because of that you're saying that because the government did not have an evidentiary hearing to meet its burden of proof with evidence sufficient to show that this was reliable, this technology, then you should prevail. Yes, Your Honor. And likewise, Your Honor, they haven't met their burden to establish attenuation or the good faith principle. That there was no binding appellate precedent with the detective authorizing this warrantless search and examination of those files when the detective in early 2020 opened those files and examined them. There was no exigency. In fact, they waited months before acting on the cyber tip. There's no evidence in the record of a legal opinion from the U.S. Attorney's Office saying that this is a valid warrantless, you know, exception to the warrant requirement. There's just nothing that fits the traditional good faith. Only that Reddick opinion was out there at the time. That's right. There was Reddick in the Fifth Circuit, but there was sort of contrary strong signals from Ackerman in the Tenth Circuit. So there there was no strong body of law that would have provided the detective objective good faith under the legal principles for the good faith exception to rely on. Well, wouldn't that help there? That helped him in terms of their argument that he wasn't that, you know, he wasn't out here just that he had no direction other than this Reddick case. Your Honor, they said that it was okay. But which is I know it's not binding in this circle. That's right. That the the test really is, is there binding precedent? And so if you look at the Stevens case, the Stevens majority opinion cited that that case dealt with, um, tracking a car with a, uh, with GPS. Uh, right before Jones came out in the Supreme Court and said, that's unlawful. You need a warrant to do that. And the Stevens case, they said, well, you had this not case from the Supreme Court that authorized electronic beepers in containers. And so that's the binding precedent that would create good faith here. You don't have that. You have a nonbinding decision in the Fifth Circuit. That's it. So the only thing else that the government could, the detective could look to objectively would be, um, the Supreme Court's case in Jacobson from the early 19 eighties, where FedEx employees looked inside a box and, uh, discovered cocaine. And that is nowhere near analogous to an algorithm that or no humans are looking at the contents of the file. That wouldn't provide good faith, Your Honor. And then going back to, uh, attenuation, uh, every, every warrant that was obtained in this case ultimately relied on information, detailed information either obtained through a warrantless examination of digital files or the contents of a prior warrant that was, that was obtained by, uh, relying on the warrantless examination of digital files. And that, and they have, the government hasn't proven that this is important under Seidman in this court, that attenuation doctrine for the government to prevail, they need, it's supposed to be a careful, nuanced sifting of the facts. It contemplates a robust evidentiary hearing that would take place to establish the attenuation doctrine. See that I'm out of time. You have been out of time here for a while, but that's all right. You've answered a lot of questions and we really appreciate your work in this. And I really appreciate you coming in here as a court appointed lawyer and handling this. Thank you, Your Honor. And, uh, Ms. Brown, we'll hear from the  Good morning, Lucy Brown for the United States and may it please the court. The government has four independent bases to affirm here, two substantive and two but any one of those is enough. I want to start substantively with whether a fourth amendment search even occurred. The defendant, excuse me, defense counsel said several times that we, the government, were the only ones with the burden, but he has an initial burden of showing a reasonable expectation of privacy and he cannot do that for his Google account. Getting this Google account, you agree to terms of service that say we might look at your account for child pornography. Google has said as a business, we don't want to be a safe haven for child pornography, right? It said we may look at the affidavit says we may look at your account for, um, um, child, child sexual abuse material. The terms of service say that the privacy policy says that they will look for what was the, what did the affidavit that the court use that was argued in the district court? What did it say? May. So it's a little confusing because it, I think May's enough. I think May means that they're entitled to. I agree, your honor, and I think it certainly reduces. I may do it. That's right. I'm entitled to do it. I agree and I think it certainly reduces an expectation of privacy, which is the question. To your honor's question, Judge Thacker, the affidavit says we may, meaning she is the affiant is writing that and then it begins quoting the privacy policy that says examine your content for illegal content. But the actual policy privacy policy itself says we will analyze. It does not say May when it says that in the privacy policy that was the affiance may in the affidavit, which I agree is a little confusing. Is it possible to have a right to privacy in contraband? No. And child pornography is contraband. Yes, it's absolutely prohibited. Yes, it's a That's where the government starts. Yes, your honor. You can't have a privacy right in contraband. Yes, your honor. And in that, that's exactly what Google is saying to that. We don't want this here. We will search for this. We will search for in a way that we will only detect child pornography. We will not be. This doesn't alert some of those Fourth Amendment concerns that defense counsel mentioned in his brief. They're not seeing innocent material. They're not getting into the contents of your emails. They're looking for this thing that both the government and Google has said you cannot store here and he did not meet that reasonable expectation of privacy rallying Carpenter and this whole evolution of technology and those lines of cases. How does this square up with rallying in in in Carpenter? So they're different in important ways. One is we have the private search component here. This isn't a government process. This is someone else gathering that information and providing it to the government. And as Judge King mentioned since 1921, that's been a well established practice that does not violate the Fourth Amendment. So that's one and that's a major ones. I'm sorry, Google and the Internet hasn't been around since 19. Did you say 21? Private search has been around since 19. So I mean, the Supreme Court has said that the Internet is a whole different creature here, haven't they? I'm not sure how to answer that. I think in some ways, of course, we're dealing with something different. I think hash matching technology is unlike anything in the analog world, but I think in other ways they have tried to map on those analog practices to this new digital world. And I have a question about the hash matching technology, but I don't know if you answered Judge Benjamin's question before I jumped in there. So go ahead. Thank you. So the one component of that is the private search doctrine that this is different. This is someone else gathering this information. The other part of that is the information that they were gathering in those cases is purportedly innocent information that you have a privacy right to, which is also different here where we're just talking about child pornography. So those are two differences to those cases that you asked about, Judge Benjamin. So you think, what is it, Cabela's? Isn't that the case that says if it's contraband, then you have no right to privacy? I don't think you have a right to privacy in child pornography, and I certainly don't think you do if you're uploading it to a Google account that has told you, hey, we're going to be looking for this. I think the defendant knew that. That's why he registered it under this alias Harvard Epperstein and put no personal information. He had a personal Google account. He didn't use that for his child pornography. And that account lasted for, what, 30 minutes or so? That's right, Your Honor. And this was the only ... And there was nothing in the account except child pornography. That's right, Your Honor. It wasn't used even once for some legal purpose. That's right. It was exclusively this, and I think that shows the defendant did not expect privacy in an email account. That's why he tried to make a separate one. That's why he didn't use the one linked to his name and his private information, because he knew he was taking some risk doing this, and that's enough. That shows he didn't have that reasonable expectation of privacy. And we're dealing with a Google account. This isn't like your home. This isn't like some of the sort of nightmare scenarios that defense counsel mentioned in his brief or the Ninth Circuit mentioned in Wilson. This is not like a search of law enforcement in your home. This is like a search of a storage unit proprietor. It's more than just your home. Your Google account could have more than you have in your home. It's more invasive. I'm not sure I agree with that premise, but I think one key difference is by the nature of a Google account. I'm not talking about the material that's in it. Certainly it can contain sensitive material. That's not what they're looking for here. That material they don't see, that is safe. Where in the record can I look to find information about the reliability of Google's hashtag technology? I understand your Honor's question, and I think we did not have it in theory. You understand it because it's not in the record? I'm not sure it's not in the record. It could have been developed further. Where is it then? We talk about it in our motion. We talk about how hash matching is the equivalent. In your motion? I'm sorry, our response, Your Honor. It's an argument? There's no evidence? It's just an argument? This is where I'm trying to clarify. In our response in the district court, we talk about a hash match and using it as almost like a digital fingerprint. If they've seen it before, they assign a number and they have a hash. What do you cite to support that? The fact that there wasn't- Case law or an expert? There wasn't a dispute about the facts in this case. The district court understood them to be stipulated to. I think what defense counsel has- You're saying that appellant stipulated to the reliability of this hashtag technology? I'm saying that is what the district court found, and I think that's right. I think what they have contested is the protocol at Google, that they don't know how those determinations are made. I don't think he has ever, nor could he ever, say that the hash matching technology itself is inaccurate, and I think that's the key difference here. We're in private search land here. You're saying appellant has never said that the hash matching technology is inaccurate even though it could be? It could be to one in 9.2 quintillion, yes. We have to take them as accurate? I would certainly think so. That's the best odds I've ever heard. And Judge Meyers accepted them as accurate, and having been stipulated to? Certainly. I think any questions they've- And that stipulation is not contested on this appeal? The accuracy of hash matching, I do not understand to be contested. And where is it that appellant stipulates to the accuracy of hash matching? That was Judge Meyers' conclusion based on reading the two briefs. No, but so where in the brief did the appellant stipulate to the hash matching technology? They weren't styled as stipulations. What Judge Meyers concluded is, the facts presented are not materially different. I think what they are contesting is not the accuracy of hash matching. What they are contesting is how does Google use this technology in making those determinations about if something should be considered child pornography? But that is of no moment when we're talking about private search. Private search does not care if you get that initial determination right. Private search only cares about if what the government actor is seeing is what the private actor's got. But Google only looked at 31 of the child sexual abuse material images, and law enforcement then looked at others outside of that 31. And that's their issue, and they did that without getting a warrant, which would have been exceedingly easy to do, especially after all these years. But they didn't bother to do it. They did not do it initially. They did do it eventually. Well, they didn't do it before they looked at the images. It says in the brief here that every one of them were looked at by Google employees. Your Honor, yes, that is the only way there can be a hash match. Not every one of them. 31 of them were opened. On these facts, in this case, 31 were opened. But the only 31. Everything that has to do with the hash match has been looked at by a person. Yes. The 156 have all been seen by Google before. 156 had all been looked at by a human being. Oh, yes. Before in some other case is what you're talking about. That's how they get in that hash match repository to begin with. I understand that. But in this case, the case we're talking about, Google only opened 31 of the images, and that was the report they made to law enforcement. Yes. Who then opened additional.  Yes, Your Honor. All 156 were. All 156 were child pornography according to Google's hash matching. Yes. So there's no error whatsoever. Yes. According to Google on this record. Yes. So why does Google, if we are to rely solely based on the hash matching in 156, why does Google have employees, I guess, human eyes look at the 31? Isn't it to verify that that's what it is? I don't know their thinking. I think they are. They certainly do review those items. Yes, Your Honor. Well, it's exactly what Judge Benjamin said. I thought the briefing said that that's why Google looked at it, to verify that it was child sexual abuse material. I'm sorry. I don't understand. I don't know their motivation. I think that is what they're doing. Yes. They are opening those, confirming that it matches. What? Well, do you have a follow up? Because they want to make sure that what they're reporting is reliable. Yes. Right. Because they don't want to solely... To me, it seems as if Google is not solely relying on this hash match, the 156, and they have to go in and verify the 31 to make sure that the algorithm is correct, because it's just the algorithm, right? I think to use the term from earlier this morning, that is a belt and suspenders approach that they have adopted. Yes, Your Honor. They have the hash match, then they review those images. Yes. How accurate is the algorithm? My understanding from that hash matching itself is more than one in 9.2 quintillion, I think was the number. And your understanding comes from what expert in the record? There is not, Your Honor. Yeah. How did they get it in this record? Judge Myers, in his order, relied on secondary sources and other cases that discuss the reliability of hash matching, of which there are many. And were they submitted by the government? They were not, Your Honor. Mm-hmm. The other component of things is Fourth Amendment issues aside, and I understand these are complicated issues, but in this case, they don't even need to be decided. I think the government should prevail on them, but they don't even have to be decided. And even if the court finds there is a Fourth Amendment problem, we have two prudential avenues to affirm this case as well. One being attenuation, and the opposing counsel said that our chief argument other than passage of time, there is no chief . . . But before you get to that, I can't . . . You just said that the district court relied on other cases and facts in other cases for that statistic that you just put out there without an expert in the record. Is that correct? I don't remember if that statistic came from another case or a secondary source, but yes, Your Honor, it was not submitted by the parties. All right. And doesn't our Fourth Circuit case, Zayad, Z-A-Y-Y-A-D, say that facts adjudicated in prior cases cannot be used in that way? I have not reviewed that case before today, Your Honor. I certainly trust your understanding. Even if we have a Fourth Amendment problem in this case, and the government, of course, argues that we do not, we do not have an affirming problem in this case. If the government has a Fourth Amendment problem, if, where does it start? I think the only Fourth Amendment allegation that they have is that the Virginia detective opening the images sent by Google . . . This was the Chesapeake Police Department. Yeah, Chesapeake . . . Opening the additional images that nobody at Google had confirmed prior. From this time. Right. Are any of those . . . There were three of them. Are any of those three being used against this defendant? There were at least three, and no. Those are not . . . None of those images are what the defendant was indicted for. None of them in this case. Which brings me to our attenuation . . . You mean the three, but the warrant does reference the images in the 156. That's how he was able to get the initial evidence. I think that's what Judge King was asking, that she reviewed at least three outside of the 31. They're all from the 156, unless I'm misunderstanding your question. That's what I was getting at, but whether they were used to indict him. No. None of the three were used against him. That's right. But the description she gives doesn't say what she used out of the 156, right? It has the hash match itself, and that's how they, I think, tried to check that against the list and discover that they were not of the 31 that Google had opened. I'm not sure I'm understanding your question. So I guess what I'm asking is, so we don't know the description that she gives. We don't know if that's in the 31. We don't know if that's in . . . We know it's not in the three, or is it somewhere out here in the other, I guess, I don't . . . my math is not . . . But whatever the other 120-something. We don't know that description. We don't know that it's in the 31 that were reviewed, right? The ones that she has listed, there's one in the initial warrant, and there are three in another. And I don't think any of those four are from the 31, based on those numbers. The ones that were reviewed by Google. That's right. I don't think that's a problem for the reasons in our brief, but that's my understanding of the facts, Your Honor. And I think to Judge King's point, none of those 156 are the images or files that the defendant was indicted for and pled guilty to. And that makes this case very different. Because you pulled those off of the devices that he turned over. That's right. After giving his consent, giving an interview, providing his device to be searched, then they found four new images, and then those images were put in a warrant. And I understand that as your sort of attenuation argument. So many steps and years down the road. What is your good faith argument? The good faith argument is that at this time, when Detective Ryder opened those images, she was acting, reasonably acting in what she believed to be a constitutional way. Based on what? Based on what precedential authority? And we do not have a precedential authority. Well, then that's how good faith works. I'm not sure that's the only way good faith works. I think in the Davis case, the court talked about other expansions of the good faith policy to include a reasonable law enforcement mistake. I think in the case they mentioned there, it was reliance on a database that had some mistaken information. So what was the reasonable mistake? If her looking at it was a mistake, our position would be that was reasonable because she did not think she was acting in an unconstitutional way. Based on what? What binding appellate precedent specifically authorized this search? We do not have a binding appellate precedent. What we have is what her mindset would have been and what the way she was acting. It indicated to her that these were apparent child pornography. Yes. Determined by Google. Yes. Which was absolutely true. Yes. So then she should have gotten a search warrant to look at the rest of them. Google had made that determination. Google had made that determination. The only published opinion in the country at that time said that this was acceptable. That is our good faith argument, Your Honor. Said that what was acceptable? Opening these documents. Has it since, and there's been case law since, that this was not acceptable? There's one opinion since that says it wasn't. The Second Circuit, which went against us substantively, actually found good faith for that very reason. For saying that at the time, the one appellate court that had weighed in had said, and this was the Fifth Circuit Reddick opinion, had said this was okay for her to do. We think that shows good faith. But I think getting back to attenuation, Defense Counsel characterizes our chief argument and mentioned two out of the three. There is no chief argument in attenuation. The government has strong standing on each of those three arguments for attenuation. We have temporal distance of six to seven months. We have intervening circumstances, including the quintessential act of free will, which is that consensual encounter, consensual examination, a search warrant for his home, looking at an item he directed us to. And the one that's considered particularly important in Brown, Brown, the case where agents are waiting for a defendant with guns drawn inside his home, we could not be further from that in this case. So this, even if the Fourth Amendment issues are complicated, even if we lose, this is an excellent case for attenuation. The government meets each of those prongs decisively. And for all the reasons in our brief, we would ask that this court affirm. Now, you said there were four ways you could win. Yes. Did you ever list them in order? I'd be happy to. So substantively, the way they are in our brief is there was no Fourth Amendment search because there was no expectation of privacy. The second one is this was a private search. Then our prudential arguments are, and I think in the order in the brief says, good faith and then attenuation. Okay. Now, if good faith or attenuation work, why do we rule on a constitutional question? You don't have to. Did you ever, you know, you're familiar with Icewander? Familiar, yes. Could I discuss it with you right now without having read it more recently? I'm afraid not. The principle of Icewander is that a court shouldn't address and resolve a constitutional question if the dispute can be resolved on a non-constitutional basis. Yes, Your Honor. And that's what our introduction in our brief says. You don't even have to get into this. And that would mean that if the government acted in good faith, we'd go right to it. That's right. But that wouldn't help the situation here with circuit split and advice to the parties and Googles of the world about private searches and the like. It wouldn't develop that. It would decide this case. And we would ask you for whatever basis we have for each of them is sufficient. And you also ask, say that there might be a need for a hearing. If none of those four persuade the court... But you say that in your brief. That's right. Yes. If none of those four persuade the court, I think the record does suggest that the detective looked at all 156... Would you put an expert on the next time if you got a hearing? We would follow the terms this court set for a remand. I'm going to ask you about that. If there was a hearing, what would be the issues that you would propose needed to be determined? You don't tell us that. You just say an evidentiary hearing. I do think I tried to say that, but I'm happy to have a chance to clarify if that didn't come across. What we are asking specifically is a hearing to determine if Detective Ryder in Virginia actually looked at all 156 images, which would necessarily include the 31 that Google viewed. I think the record suggests that she did. And so I think defense counsel has recognized that if she did, that severely undermines his argument. And that, I think the district court did not make a decisive finding on. I thought you would want a hearing or determination of the accuracy of the algorithm. I think that would certainly be in our interest, but I also understand that we would follow whatever restrictions the court put on a remand. The factual issue . . . No, I'm listening for your advice. We need the lawyers, if we're going to talk about asking for a hearing, an evidentiary determination, what . . . we ought to have both sides weighing in on what we would ask the district court to do. If we had it to do again, I would recommend that we bring an expert about the reliability of hash matching. If the court has concerns about that, as I understand that it may, at least members of the panel may, I think the factual, the narrow factual issue that we put in our brief about developing whether Detective Ryder looked at all the images, which would undermine their private search concern, because it would necessarily include the 31 that Google had viewed, I think that is something that was put forth on the record and the district court did not make a conclusive finding about. Unless there are any other questions? Thank you for your time. We would ask that you affirm. Thank you very much, Ms. Brown. Mr. Tarleton? Thank you, Your Honor. At joint appendix 277, this court will see that Mr. Lowers did not stipulate to the reliability of Google's hash matching proprietary technology. What did you say, 277? Yes, Your Honor. It's Mr. Lowers' reply to the government's response on suppression. That was in the district court? That's right, Your Honor. Did you raise that point with the judge? It's indicated in his opinion. But did you raise that, that he was wrong in saying you had stipulated? Has this been preserved, this issue? Was it raised or is it up here now? You're raising it now for the first time? She raised it. And it's not accurate? No, the district court said you stipulated and then Ms. Brown said the district court said you stipulated. Now, you're saying you didn't stipulate. Had you raised the point that you say you haven't stipulated with the district court? To answer your question precisely, no. That said, Your Honor, the district court did not say we stipulated to the reliability of Google's hashing technology. The district court's note . . . Oh, the district court didn't say that? The district . . . right. You say Ms. Brown is wrong? That's correct. That it's inaccurate. The district court did not . . . am I correct? The district court did not say that you stipulated. The most the district court said is that the recitation of the facts appears similar or something like that and she takes that to mean it's a stipulation of some sort. I think you used the word stipulation. My recollection. Judge Thacker, the stipulation is the first footnote in the district court's order denying suppression. The district court says essentially there's a stipulation between the parties as to material facts. That's all that says. There you go. Right. Right. That must be what I'm remembering. Right. There's nothing about it, but . . . okay, go ahead. The district court went on to then on its own bring in case law and law review articles on hash matching technology, but this is what I'm getting at in court notes to . . . Because it needed to fill in the gap that the government did not put in any evidence to support the reliability of that technology. Exactly, Judge Thacker. What Mr. Lowers last said to the district court before it ordered was in his reply 227 in the JA. Mr. Lowers certainly maintains Google's proprietary technology does not render a virtual certainty that two files are the same. The analysis in Wilson hinges on that fact, as in this case, Google does not keep a repository of child pornography images. So no Google employee could have shown the government the images it believed to match Wilson's, nor does the record identify the individual who viewed those images in the repository. So no identified Google employee knew and could say what those images showed. And that was in your brief before the district court, so you . . . That's correct. Furthermore, the government here says Mr. Lowers doesn't have an expectation of privacy in a Google Drive account. That is synonymous with a Gmail account. Can you have an expectation of privacy in contraband? No, no one has an expectation of privacy in per se contraband. No one does, Your Honor. No one does. Right. Child pornography is per se contraband. It is, Your Honor, yes. So you can't have a right to privacy in child pornography. But if you have child sexual abuse material in your home, in a drawer, you have a reasonable expectation of privacy there, correct?  And if you have child sexual abuse material in your Gmail account, in a drawer in the internet, your argument is you have a reasonable expectation of privacy there? Exactly, Your Honor. You don't have an expectation of privacy in a brick of cocaine, but you have an expectation of privacy in a closed book bag that may ultimately reveal a brick of cocaine. That's the digital containers, papers, and effects that the Fourth Amendment protects, that the trilogy of Supreme Court cases, Riley, Jones, Carpenter, all extend traditional Fourth Amendment expectation of privacy doctrines into the world of digital files and digital containers. In every circuit that is confronted, more importantly, this circuit, in this court, Zelaya Veliz, said that there is a Fourth Amendment expectation of privacy in your private Facebook messages. That's a social media account. Those work similar to email. So if you have, this court has foreclosed the government's argument. In every circuit that confront the government's argument head on, Mayor in the Second Circuit, the Sixth Circuit in Warshak, Tenth Circuit in Ackerman, every circuit, Wilson, or in the Ninth Circuit, have refuted this idea that you don't have an expectation of privacy. An email just calls it exists on a cloud server. So that shouldn't be any basis to not reverse the district court's order. On attenuation, I think maybe the biggest prism to think about is the government has the burden of proof to show attenuation. Seidman, this court, talks about how that is a careful sifting of facts, nuanced facts even, and that didn't, where they have the burden, that didn't happen here because they told the district court at JA, I think 234, every issue here is a matter of law. We don't believe an evidentiary hearing is necessary. And so now they are seeking to have a redo. If the evidence is insufficient in a case, this court doesn't traditionally remand for a new trial. They shouldn't do so here. Well, there hasn't been a trial. By analogy, Your Honor. It wouldn't be a new trial. It would be a remand for a hearing, is what she said. Given an analogy, but they— But you haven't indicated any position previously on that. I understand, Your Honor. They have not cited any case to this court that I know of that says after the government below said we don't want a hearing, when they realize they're in trouble on appeal, now we need a hearing. We need a do-over. We need a do-over. No, they have not advanced a case to this court supporting that proposition. Finally, I think Judge Thackeray said getting warrants— Have you ever heard of Ashwander? No, Your Honor. You heard the discussion of it. I did. I did, Your Honor. Yes. Getting warrants is not a heavy burden. In fact, Riley, the Supreme Court, talked about in the digital age, it's actually easier than ever to get a warrant. You can communicate electronically with judges. Probable cause is not— is only a fair probability standard, but it's an important standard. There has to be judicial constraints on law enforcement's ability to sift through the vast troves of sensitive data that exists in these digital platforms. And we are reminded of first principles from the framers, and this is identified in Carpenter, that it is actually a central aim of the framers to place obstacles in the way of too permeating a police surveillance. That is the whole foundation of the Fourth Amendment jurisprudence. It didn't happen here. They should have gotten a warrant, and everything that flowed was tainted, Your Honor. Thank you. Thank you very much, sir. We appreciate it. Again, we appreciate your work. Thank you, Your Honor. And we're going to come down and re-counsel and then go to the next case.
judges: Robert B. King, Stephanie D. Thacker, DeAndrea Gist Benjamin